IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY ARENA, | ) | CASE NO. 5:11CV477 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Gregory Arena ("Arena") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42

U.S.C. §§ 416(i) and 423.  This matter has been referred to the undersigned Magistrate Judge for

a Report and Recommendation pursuant to Local Rule 72.2(b)(1).  For the following reasons, the

final decision of the Commissioner should be **AFFIRMED**.

## I.  Procedural History

On July 22, 2003 and on January 21, 2004, Arena filed applications for DIB[1] and

Supplemental Security Income ("SSI"),[2] alleging a disability onset date of March 23, 2002.  Tr.

53-55, 56-58, 537-39, 545-48, 555-58, 618.  Arena claimed that he was disabled due to a

combination of impairments, including left knee replacement, bilateral knee pain, lower back

pain, sleep apnea, and anxiety.  Tr. 111, 1137.  The state agency denied Arena's claims initially

and upon reconsideration, and Arena timely requested a hearing.  Tr. 37-40, 41-44, 46-48, 49,

541-44, 550-53, 618.  On May 10, 2006, a hearing was held before Administrative Law Judge

---

[1]  For purposes of his DIB application, Arena's date last insured was September 30, 2007.  Tr. 61, 619-20.

[2]  As set forth in Arena's brief on the merits and discussed below, Arena is currently receiving SSI payments and his
SSI application is not at issue in this appeal.  Doc. 13, p. 3.

Mark Carissimi ("ALJ Carissimi"). Tr. 561-600, 618. On September 26, 2006, ALJ Carissimi issued a decision finding that Arena was not disabled. Tr. 16-25, 618. Arena requested review of ALJ Carissimi's decision by the Appeals Counsel (Tr. 12) and on March 2, 2007, the Appeals Council denied Arena's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 8-10, 618.

On March 23, 2007, Arena appealed the decision of the Commissioner to this Court, and was assigned case number 5:07-CV-766. Magistrate Judge Perelman issued a Report and Recommendation on January 16, 2008, in which he recommended that the decision of the Commissioner be reversed and the case remanded. Case No. 5:07-CV-766, Doc. 16. On September 9, 2008, District Judge O'Malley adopted Magistrate Judge Perelman's recommendation, reversed the decision of the Commissioner, and remanded the case to the Commissioner for a new administrative hearing. Case No. 5:07-CV-766, Doc. 19. In short, Judge O'Malley concluded that the ALJ failed to provide an adequate basis for rejecting the opinion of Arena's treating physician, Dr. Scott Rigby. Case No. 5:07-CV-766, Doc. 19, pp. 7-8.

Pursuant to the remand order, on August 19, 2009, a hearing was held before a new Administrative Law Judge, Peter Beekman ("ALJ Beekman" or "the ALJ"). Tr. 1135-60. On September 21, 2009, ALJ Beekman issued a partially favorable decision finding that Arena was disabled beginning on September 9, 2008. Tr. 618- 632. However, since ALJ Beekman found that Arena's date last insured was September 30, 2007 (Tr. 618- 632), he awarded Arena SSI benefits, but not DIB benefits. Tr. 618-632. Arena requested that the Appeals Council review ALJ Beekman's decision regarding the onset date of his disability (Tr. 613) and, on February 3, 2011, the Appeals Council denied review, making ALJ Beekman's decision the final decision of the Commissioner. Tr. 601-04.

2

## II.  Evidence

### A.    Background

Arena was born on September 10, 1958.  Tr. 53.  He was 47 years old on the date of the first hearing before ALJ Carissimi and almost 51 years old at the second hearing before ALJ Beekman.  Tr. 105, 1137.  Arena completed high school.  Tr. 112, 117.  He worked for several months in 2003 through temporary agencies (Tr. 77) and for six months in 2002 as a machine operator.  Tr. 78.  Arena also worked as a truck driver/tow motor driver.  Tr. 112, 117, 597.

### B.    Medical Evidence

#### 1.    Treatment History Concerning Arena's Physical Impairments [3]

Arena appeals the denial of his application for DIB.  As acknowledged by Arena in his brief on the merits, the relevant time period is from March 23, 2002, the alleged onset date, to September 30, 2007, the date last insured.  Doc. 13, p. 3.  As a result, the summary of the medical evidence generally will be confined to the relevant time period.

Arena's primary care physician was Scott Rigby, M.D.  Tr. 402.  Arena first saw Dr. Rigby on August 30, 2000, and Dr. Rigby noted that Arena had a very extensive history of alcohol abuse, as well as a history of pancreatitis.  Tr. 402.  At an office visit on March 31, 2003, Arena told Dr. Rigby that he was taking narcotics for his back pain that he obtained without a prescription.  Tr. 412.  Dr. Rigby noted that Arena appeared to be suffering from opioid withdrawal symptoms.  Tr. 412.

On May 12, 2003, Arena was seen at Akron General Medical Center emergency room for narcotic withdrawal symptoms.  Tr. 190-191.  Arena indicated to the staff that he had been abusing prescription pain medications – Oxycontin, Percocet, Vicodin and Vicoprofen – due to

---

[3] Arena does not challenge the ALJ's conclusions concerning his mental impairments.  Accordingly, this Report & Recommendation shall focus on Arena's medical history as it relates to his physical impairments.

chronic back, knee and hip pain, and that he obtained many of the drugs "on the street."  Tr. 190.

His past medical history was notable for pancreatitis and chronic pain, degenerative changes in

the spine, and arthritis of the knees.  Tr. 190.

Arena treated with Michael Pryce, M.D., an orthopedic surgeon, for arthritis of his knees.

Tr. 220-25.  On March 8, 2004, Dr. Pryce performed a left total knee replacement.  Tr. 220-257.

After surgery, Arena developed a deep venous thrombosis (blood clot) that required that he be

placed on blood thinners.  Tr. 224.  He also developed right lower lobe lung problems (Tr. 224)

and compartment syndrome in the operated knee.  Tr. 224.  He was transferred to Edwin Shaw

Rehabilitation Hospital on March 19, 2004, and was hospitalized until April 8, 2004.   Tr. 225,

290-309.  At a follow-up on April 5, 2004, Dr. Pryce noted that "everything looks great."  Tr.

334.  He also reported that Arena had an "unbelievably low pain tolerance" and had "no ability

whatsoever of any kind to withstand even the most minute amount of pain."  Tr. 334.  Dr. Pryce

stated that he doubted that Arena was willing to do the work necessary to increase the extension

of his leg based on his low pain tolerance.  Tr. 334.

On April 23, 2004, Arena presented to Dr. Rigby for a follow-up appointment.  Tr. 414.

Dr. Rigby noted that Arena was doing "quite well" post-knee surgery.  Tr. 414.  He also reported

that Arena was "without complaints" and that his knee pain was stable.  Tr. 414.

In July 2004, Arena was placed under general anesthetic and Dr. Pryce performed a

manipulation of the left knee to increase range of motion.  Tr. 325.  Before the manipulation,

Arena could only "get his knee to about 75 degrees" of flexion.  Tr. 325.  During the procedure,

Dr. Pryce "got [Arena] to at least 110 if not 120 degrees of flexion."  Tr. 325.  On July 21, 2004,

Dr. Pryce noted that the range of motion in Arena's knee had dropped back to 95 degrees from

100 degrees following the manipulation.  Tr. 333.  Dr. Pryce cautioned Arena to really work hard

4

at extending the knee so he would not regress, and he also gave Arena a prescription for Oxycontin until Arena could get into a pain management program.  Tr. 333.

On July 28, 2004, Arena presented to Ali Shakir, M.D., a pain management specialist, for evaluation.  Tr. 491-93.  On that same date, Dr. Shakir wrote to Dr. Rigby with his initial evaluation of Arena condition and Arena's needs relative to pain management.  Tr. 491-493.  Dr. Shakir noted that Arena's longstanding knee pain began in February 1990 due to an on-the-job injury where he fell on some ice.  Tr. 491.  Dr. Shakir changed some of Arena's medications and changed Arena's physical therapy program.  Tr. 491.

On October 24, 2004, Arena presented to Dr. Rigby for a follow-up appointment.  Tr. 417.  Dr. Rigby noted that Arena had been doing "very well postoperatively."  Tr. 417.  Indeed, Dr. Rigby noted some increased range of motion in the knee.  Tr. 417.  Dr. Rigby also noted that Arena had completed a sleep study and had been diagnosed with obstructive sleep apnea.  Tr. 417.  Dr. Rigby reported that Arena was to continue with physical therapy and pain management.  Tr. 417.  In a treatment note dated February 8, 2005, Dr. Rigby noted that Arena had no specific complaints other than chronic pain syndrome and osteoarthritis. Tr. 419.  Dr. Rigby also noted that Arena was using his CPAP machine for sleep apnea faithfully.  Tr. 419.  Dr. Rigby recommended that Arena continue with treatment.  Tr. 419.

Arena's complaints of pain continued and, on May 4, 2005, Dr. Shakir performed an epidural steroid injection under fluoroscopy noted to be a right S1 lumbar selective nerve root block.  Tr. 439.  Dr. Shakir performed a second block on May 11, 2005 (Tr. 442) and a third block on May 19, 2005.  Tr. 445.  A significant improvement in Arena's right leg radicular pain was noted in June 2005.  Tr. 440.  In September of 2005, Arena's left knee was noted to have range of motion of only 10-80 degrees and he was diagnosed with an L5-S1 disc herniation.  Tr.

457.  An MRI of the right knee was performed on October 4, 2005 and multiple abnormalities including a tear of the posterior horn of the medial meniscus, chondromalacia of the patella and moderate osteoarthritis were identified.  Tr. 461.

On November 15, 2005, Arena saw Dr. Rigby after a nine-month absence.  Tr. 509.  Dr. Rigby noted that Arena had acute bronchitis and that he continued to smoke.  Tr. 509.  A full review of his other symptoms was otherwise unremarkable.  Tr. 509.

On that same date, Arena presented to James P. Bressi, D.O., for pain management.  Tr. 509.  Dr. Bressi wrote to Dr. Rigby with a new patient report on that same date.  Dr. Bressi summarized Arena's condition and noted that the prior pain management doctor, Dr. Shakir, was uncomfortable with Arena's Oxycontin dose and that Dr. Bressi did not understand the reason for Dr. Shakir's concerns.  Tr. 511.  Dr. Bressi stated that the regimen with Oxycontin works well but does not last and Flexeril helps for breakaway pain.  Tr. 511.  Dr. Bressi reported that he would take over Arena's pain medications.  Tr. 512.  Dr. Bressi continued to see Arena every other month (Tr. 749-71) and performed epidural steroid injections series on the right knee with a synovisc injection during this period.

On March 16, 2006, Arena returned to Dr. Rigby for a follow-up and complained of worsening leg pain due to an injury he sustained when he rolled off a couch on which he was sleeping.  Tr. 509.  Dr. Rigby informed Arena that a recent MRI did not correlate with his current pains.  Tr. 509.  Dr. Rigby wrote that he would refer Arena back to the pain management doctors for possible repeat MRI.  Tr. 509.  He did note that Arena had four epidural steroid shots and that his back appears to be "nonoperable" based on the current MRI.  Tr. 509.

A new MRI was performed on April 10, 2006, at Dr. Rigby's request.  Tr. 516.  This MRI showed a disc bulge at L5-S1 without thecal sac narrowing or S1 nerve displacement.  There

was small broad disc protrusion at L4-L5 with mild thecal sac and mild to moderate bilateral neural foraminal narrowing. Tr. 516. Degenerative disc disease and disc bulges were present at several additional levels with no more than minimal thecal sac narrowing. Tr. 516.

On July 10, 2006, Dr. Rigby completed a questionnaire regarding Arena's functional capacity. Tr. 535-36. Dr. Rigby opined that Arena could not perform any lifting and carrying and did not indicate any pound limitation. Tr. 535. He also opined that Arena could perform no prolonged standing, climbing, balancing, stooping, crouching, kneeling, or crawling. Tr. 535-36. He stated that Arena's sitting would not be impacted but that he would need frequent breaks to alleviate his chronic lower back pain. Tr. 535. He also stated that Arena was limited in his ability to reach, push, and pull. Tr. 536. Dr. Rigby concluded that Arena was not employable because of multiple exacerbations of chronic lower back pain and osteoarthritis. Tr. 536.

Arena continued to see Dr. Bressi throughout 2006 and 2007 for pain management. Tr. 907-63. During this time, Arena received injections for his right knee, as well as lumbar epidural injections for his pain. Tr. 734-48, 757-62, 784-804, 813-17, 820, 928-30, 933, 937, 946. On October 20, 2006, Arena informed the pain management physician that he did very well with the lumbar injections and that he experienced good function increase after receiving them. Tr. 749. Arena also reported that his pain medications were adequate and there was no need for a change. Tr. 749.

On April 30, 2007, Arena underwent arthroscopy of the right knee. Tr. 860-62. Arena participated in physical therapy after his surgery and reported some improvement of his symptoms. Tr. 623. On June 14, 2007, Dr. Bressi saw Arena for a follow-up visit and noted that Arena's knee pain was "somewhat better." Tr. 907. Arena informed Dr. Bressi that he had gotten "excellent relief" from epidural injections. Tr. 907.

7

## 2.    State Agency Physicians

In September 2003, state agency reviewing physician E.S. Villanueva, M.D., assessed Arena's residual functional capacity ("RFC").  Tr. 195-99.  He found that Arena could: (a) lift/carry 20 pounds occasionally and lift/carry 10 pounds frequently; (b) stand/walk for at least two hours per workday; (c) sit for about six hours per workday; (d) push/pull a limited amount in the lower extremities; (e) frequently climb ramps/stairs and balance; (f) occasionally stoop, kneel, crouch, and crawl; and (g) never climb ladders/ropes/scaffolds.  Tr. 197.

On March 23, 2004, state agency reviewing physician Myung J. Cho, M.D., assessed Arena's physical RFC.  Tr. 259-63.  He opined that Arena could: (a) lift/carry 10 pounds occasionally and lift/carry less than 10 pounds frequently; (b) stand/walk for at least two hours per workday; (c) sit for about six hours per workday; (d) push/pull an unlimited amount; (e) occasionally climb ramps/stairs, balance, stoop, and crouch; (f) never climb ladders/ropes/scaffolds, kneel, or crawl; and (g) not be exposed to workplace hazards.  Tr. 259-63.  State agency physician Teresita C. Cruz, M.D., confirmed Dr. Cho's findings on July 6, 2004.  Tr. 260-61.

On April 2007, state agency reviewing physician Gerald Klyop, M.D., assessed Arena's physical RFC.  Tr. 850-57.  He opined that Arena could: (a) lift/carry 10 pounds occasionally and lift/carry less than 10 pounds frequently; (b) stand/walk for at least two hours per workday; (c) sit for about six hours per workday; (d) push/pull an unlimited amount; (e) occasionally climb stairs and ramps; and (f) never climb ladders/ropes/scaffolds, kneel, or crawl.  Tr. 851.

**C.**    **Testimonial Evidence**

**1.**    **Arena's Testimony**

On August 19, 2009, Arena appeared with counsel and testified at the administrative hearing.  Tr. 1135-60.  He stated that he was unable to work because of bilateral degenerative joint disease of the knees, degenerative disc disease of the lumbar spine, obstructive sleep apnea, and anxiety.  Tr. 1137.  Arena stated that he has been limited in his ability to bend his left knee since having his knee replacement surgery.  Tr. 1143.  In addition, since having his left knee replaced, Arena stated that he was having increased pain in his right knee and that he needed to have his right knee replaced.  Tr. 1143-44.  Arena stated that he wears knee braces every day. Tr. 1144.  In addition to his knee pain, Arena reported that his back pain is sharp and throbbing and is aggravated by bending over.  Tr. 1145.  Arena uses a CPAP machine for his sleep apnea. Tr. 1143.  He stated that his medications from his pain management physician helped with his pain and that he did not experience side effects from those medications.  Tr. 1145.

Arena stated that he has a driver's license and that he drives two to three times per week. Tr. 1141-42, 1147.  He stated that the longest trip he made in the past five years was probably about 50 to 60 miles.  Tr. 1142.  Arena also testified that he visited with his brother regularly and that he was big into sports and watched television daily.  Tr. 1140-41.  Arena also reported that he works on puzzles and crossword puzzles.  Tr. 694.

**2.**    **Medical Expert's Testimony**

Board certified neurologist Hershel Goren, M.D., testified as the medical expert ("ME") at the hearing.  Tr. 1148-55.  He testified that Arena's impairments included arthritis in both knees, a knee replacement on the left side, left foot drop, and obstructive sleep apnea.  Tr. 1148. The ME opined that Arena did not have an impairment or combination of impairments that met

or equaled a listed impairment.  Tr. 1149.  He also opined that Arena retained the capacity to: (a)

lift/carry 10 pounds occasionally and lift/carry less than 10 pounds frequently; (b) stand/walk for

at least two hours per workday; (c) occasionally stoop and crouch; and (d) never climb, kneel,

crawl or use foot controls.  Tr. 1149.  The ME stated that Area should avoid unprotected heights.

Tr. 1149.  The ME concluded that Arena could sustain a 40-hour workweek with normal breaks

at the RFC that he found for Arena.  Tr. 1151.  Regarding Dr. Rigby's opinion that Arena was

unemployable, the ME stated that he did not see evidence in the record where Dr. Rigby

performed enough of an examination to reach that conclusion.  Tr. 1151.  He also noted that Dr.

Rigby is not an orthopedic surgeon.  Tr. 1151.

### 3.    Vocational Expert's Testimony

Evelyn Sindelar, a vocational expert (the "VE"), also testified at the hearing.  Tr. 1155-

58.  The VE stated that Arena had previously worked as a truck driver, which included unloading

trucks (semi-skilled position generally performed at a medium exertional level, but was

performed by Arena at a heavy to very heavy exertional level).  Tr. 1155-56.  ALJ Beekman then

asked the VE to consider a hypothetical individual with Arena's vocational characteristics and

the following limitations: (a) could lift/carry 10 pounds occasionally and less than 10 pounds

frequently; (b) could stand/walk two hours per workday; (c) could sit six hours per workday; (d)

no limit on push/pull, but could never use foot pedals; (e) could frequently balance; (f) could

occasionally climb ramps/stairs, stoop, crouch; (g) could never climb ladders/ropes/scaffolds,

kneel, or crawl; (h) must avoid unprotected heights; (I) could do complex tasks; (j) should do no

work involving arbitration, negotiation, or confrontation; and (k) should have only superficial

interpersonal interactions with the public and coworkers.  Tr. 1156-57.  The VE testified that the

hypothetical individual could perform unskilled, sedentary jobs, including proof reader (35,000

jobs nationally and 3,500 jobs in Ohio), bench assembler (30,000 jobs nationally and 3,000 jobs in Ohio), and inspector (30,800 jobs nationally and 3,500 jobs in Ohio).  Tr. 1157-58.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

In his September 2009 decision, the ALJ found that Arena had not engaged in substantial gainful activity since March 23, 2002, his alleged disability onset date.  Tr. 621.  The ALJ determined that Arena had the following severe impairments: degenerative joint disease of the knees, status post total knee arthroplasty on the left and residual left foot drop, degenerative disc disease of the lumbar spine, anxiety disorder, and obstructive sleep apnea.  Tr. 621.  The ALJ found that Arena did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[4]  Tr. 621.  The ALJ then concluded that Arena could perform a restricted range of sedentary work[5] in that he could:

Lift and carry 10 pounds occasionally and less than 10 pounds frequently.  In an

_____

[4]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[5]  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. § 404.1567(a).

> eight-hour day, []he can sit for six hours and stand and/or walk for two hours.  He
> cannot use foot pedals.  He can occasionally stoop, crouch, and climb ramps or
> stairs.  He cannot kneel, crawl, or climb ladders, ropes or scaffolds.  He can
> frequently balance.  He cannot work in proximity to unprotected heights.  He is
> able to do complex tasks.  He cannot perform work involving arbitration,
> confrontation or negotiation.  He is limited to work with no more than minimal
> interaction with the public and co-workers.

Tr. 622.  The ALJ determined that, since March 23, 2002, Arena could not perform his past

relevant work as a truck driver.  Tr. 627-28.

After determining Arena's RFC, the ALJ found that, prior to September 9, 2008 (the

"established disability onset date"), Arena was a younger individual, age 45-49 but, on his

fiftieth birthday, Arena's age category changed to an individual closely approaching advanced

age.  Tr. 628.  Prior to September 9, 2008, the ALJ used section 201.21 (younger individual age

45-49) of the Medical-Vocational Guidelines (the "Grid") as a framework for his decision-

making, coupled with the VE's testimony, and concluded that there was a significant number of

jobs in the economy that Arena was capable of performing.  Tr. 628.  The ALJ then determined

that, after Arena's fiftieth birthday, a finding of "disabled" was directed by application of section

201.14 of the Grid.[6]  Tr. 629.  The ALJ therefore determined that Arena was not disabled prior to

September 9, 2008, but became disabled on that date and continued to be disabled through the

date of the ALJ's decision.  Tr. 629.  Based on these findings, the ALJ concluded that Arena was

not disabled for purposes of his DIB application at any time from his alleged onset date through

September 30, 2007, the date last insured, but awarded his SSI benefits.  Tr. 629-30.

---

[6] The Medical-Vocational Guidelines, known as the "Grid," are located at 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grid"). The Grid is composed of Rules 200.01-204.00.  *Id.*   The Grid includes rules that may be applied in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work.  20 C.F.R. § 404.1569.  However, the rules contained in the Grid do not cover all possible variations.  *Id.*

## V.  Arguments of the Parties

Arena objects to the ALJ's decision on three grounds.  First, Arena argues that the ALJ failed to articulate a valid basis for not giving controlling weight to the opinions of Arena's treating physician.  Second, Arena asserts that the ALJ did not articulate a valid basis for finding that Arena's subjective complaints of pain were only partially credible.  Finally, Arena alleges that the ALJ failed to carry the Commissioner's burden at Step Five of the sequential evaluation because his hypothetical question to the VE did not address all of Arena's limitations.  Doc. 13, p. 11.

In response, the Commissioner asserts that substantial evidence supports the ALJ's decision.  The Commissioner argues that the ALJ properly evaluated the medical opinion evidence pertaining to the relevant time period and properly assessed Arena's credibility.  The Commissioner also contends that the ALJ's hypothetical question to the VE was proper.  Doc. 16, pp. 8, 16.

## VI.  Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the

evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.      The ALJ Properly Evaluated the Opinion of Arena's Treating Physician**

Arena argues that the ALJ failed to articulate a valid basis for not giving controlling weight to the opinion of Dr. Rigby.  Doc. 13, p. 12.  Contrary to this argument, the ALJ properly evaluated the opinion of Dr. Rigby under the treating physician rule and provided an adequate basis for assigning his opinion less than controlling weight.

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent

reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.  However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

In his July 2006 assessment, Dr. Rigby opined that Arena could not perform any lifting or carrying and did not specify any limitation on the amount of weight Arena could lift/carry.  Tr. 535.  He also opined that Arena could perform no prolonged standing, climbing, balancing, stooping, crouching, kneeling, or crawling.  Tr. 535-36.  He stated that Arena's sitting would not be impacted but that he would need frequent breaks to alleviate his chronic lower back pain.  Tr. 535.  He also stated that Arena was limited in his ability to reach, push, and pull.  Tr. 536.  Dr. Rigby concluded that Arena was not employable because of "multiple exacerbations" of chronic lower back pain, sciatica, and osteoarthritis.  Tr. 536.

To the extent that Dr. Rigby concluded that Arena was unable to work, the ALJ was not obligated to give any weight to his opinion.  A medical source's statement on an issue reserved for the Commissioner, such as an assertion that a claimant is "disabled" or "unable to work," is a legal conclusion and not a medical opinion.  20 C.F.R. § 416.927(e).  Such statements are not entitled to any special significance.  20 C.F.R. § 416.927(e)(3).  "The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician." *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004).  Thus, Dr. Rigby's opinion that Arena could not work was not entitled to any particular weight.[7]

---

[7] Dr. Rigby's opinion is also vague in that he did not explain what he meant by stating that Arena was unemployable due to "multiple exacerbations" of his impairments.

16

Here, the ALJ considered Dr. Rigby's opinion and the record as a whole and reasonably decided to give Dr. Rigby's opinion weight, but not controlling weight.  Tr. 624.  In fact, the ALJ accepted most of the limitations set forth by Dr. Rigby and accounted for those limitations in his RFC determination.  Arena admits this.  Doc. 13, pp. 13-14.  However, the ALJ rejected Dr. Rigby's conclusion that Arena was not capable of any lifting or carrying whatsoever and his limitation of occasional crouching, stooping, or climbing ramps or stairs.  Tr. 622-24.  The ALJ explained his reason for not giving full weight to Dr. Rigby's opinion, stating that Dr. Rigby's opinion that Arena could not perform "any" lifting or carrying suggested that Arena would not be able to lift a cup or utensil, which he determined was not consistent with the record.  Tr. 624.  This explanation demonstrates that the ALJ discounted Dr. Rigby's opinion under the factors of supportability and consistency and therefore fulfilled his obligations under the regulations.  *See, e.g., Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (finding that an ALJ provided good reasons for discounting treating physician opinion where the ALJ's stated reason was brief but reached several of the factors an ALJ must consider when determining what weight to give non-controlling opinion).

A review of the record reveals that the reasons provided by the ALJ for discounting Dr. Rigby's opinions are supported by substantial evidence.  For example, the ALJ noted that, on May 19, 2003, Arena sought emergency treatment for a headache and reported that he had been cleaning out the gutters on his house.  Tr. 192, 627.   In May 2004, Arena reported to his physical therapist that he was mowing the lawn.  Tr. 379, 381.  In December 2007, Arena told his psychiatrist, Dr. Brian Welsh, that he had been helping to take care of his aunt, who lived in Pennsylvania, and that he would be visiting her soon.  Tr. 518.  In addition, in written statements submitted to the Social Security Administration, Arena reported that he helped mow the lawn

(Tr. 86, 123), helped with snow in the winter (Tr. 86), and drove his mother to the store, the bank, and to other appointments.  Tr. 121.  He also testified that he continues to drive.  Tr. 1141-42, 1147.  This evidence is at odds with Dr. Rigby's opinion that Arena could not perform even a limited range of sedentary work.

The ME's testimony also supports the ALJ's RFC determination and decision to assign less than controlling weight to Dr. Rigby's opinion.  Tr. 1148-55, 626.  An ALJ is permitted to consider opinions from medical experts on the nature and severity of a claimant's impairments.  20 C.F.R. § 404.1527(e)(2)(iii)(March 26, 2012).  Such opinions must be evaluated according to the same rules applicable to other opinion evidence.  20 C.F.R. § 404.1527(a) to (d)(March 26, 2012).  Here, upon his review of the entire record, the ALJ utilized his discretion and gave great weight to the opinion of the ME because it was consistent with other substantial evidence.  Tr. 626.  See 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion").  The ME opined that Arena retained the capacity to: (a) lift/carry 10 pounds occasionally and lift/carry less than 10 pounds frequently; (b) stand/walk for at least two hours per workday; (c) occasionally stoop and crouch; and (d) never climb, kneel, crawl or use foot controls.  Tr. 626, 1149.  The ME also stated that Arena should avoid unprotected heights.  Tr. 626, 1149.  He concluded that Arena could sustain a 40-hour workweek with normal breaks at the RFC he set forth above.  Tr. 626, 1151.  The ME also specifically addressed Dr. Rigby's opinion that Arena was unemployable.  He stated that he did not see evidence in the record where Dr. Rigby performed enough of an examination to reach that conclusion.  Tr. 626, 1151.  The ME also pointed out that Dr. Rigby is not an orthopedic surgeon.  Tr. 626, 1151. The ALJ discussed the ME's opinion in detail, found that it was consistent with the evidence as a whole, and reasonably decided to give it great weight.  Tr. 626.

Consistent with the ME's finding that Arena could perform a restricted range of sedentary work, all of the state agency reviewing physicians concluded that Arena could perform at least some work.  Significantly, agency regulations provide that state agency reviewing sources are highly skilled medical professionals who are experts in social security issues.  *See* 20 C.F.R. § 416.927.  As discussed above in the medical background, none of the state agency reviewers agreed with Dr. Rigby's assessment that Arena could not perform even a restricted range of sedentary work.  However, resolving all doubt in Arena's favor, the ALJ gave those opinions limited weight and incorporated more limitations in the RFC than those set forth by the agency physicians.  Tr. 625-26.  All of this evidence supports the ALJ's determination to give less than controlling weight to Dr. Rigby's opinion.

In his reply brief, Arena asserts that remand is necessary because the only portion of Dr. Rigby' opinion that the ALJ gave a good reason for discounting was his opinion on lifting and carrying, not his opinion on crouching, stooping, and climbing ramps or stairs.  Doc. 17, pp. 1-2.  However, the ALJ provided a reason for assigning less than controlling weight to Dr. Rigby's opinion as a whole.  As noted in Social Security Ruling ("SSR") 96-2p, "it is not necessary in every case to evaluate each treating source medical opinion separately . . . Adjudicators must use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address separately each medical opinion from a single source."  SSR 96-2p, 1996 WL 374188, *2.  Thus, the fact that the ALJ did not specifically address each of Dr. Rigby's opinions does not, *ipso facto*, amount to reversible error.

Further, a lack of specificity in an ALJ's analysis of a treating physician's opinion does not require remand so long as the ALJ correctly applied the "substance of the treating physician rule" such that the claimant "received the rule's procedural advantages."  *See Halloran v.*

19

*Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004).  Because the good reasons requirement exists, in part, to let claimants understand the disposition of their cases, an ALJ's opinion must enable the claimant to understand why his or her treating physician's opinion was not followed.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242-43 (6th Cir. 2007).  Considering the decision as a whole, the ALJ applied the substance of the treating physician rule.  He specifically rejected some, but not all, of Dr. Rigby's conclusions on the bases of their supportability and consistency with other evidence in the record.  The ALJ also provided additional reasons for assigning less than controlling weight to Dr. Rigby's opinions when he discussed the testimony of the ME, who opined that Dr. Rigby was not a specialist and did not perform enough of an examination on Arena.  Thus, even though the ALJ's analysis lacks some specificity, his explanation demonstrates that he considered the factors he was required to consider under the regulations in determining what weight to give Dr. Rigby's opinion.  The ALJ explained his reasons for failing to give controlling weight to the opinion sufficiently to allow a subsequent reviewer to understand how he arrived at his RFC determination.  Arena therefore received the rule's procedural advantages and remand is unnecessary because the ALJ's RFC determination is supported by substantial evidence.

Overall, the ALJ applied the correct legal standard and provided good reasons for assigning less than controlling weight to the opinion of Dr. Rigby.  Substantial evidence supports this determination.  Accordingly, the ALJ did not violate the treating physician rule.

**B.     Substantial Evidence Supports the ALJ's Credibility Determination**

Arena claims that he is so incapacitated by pain that he could not perform even simple, sedentary work before his last date insured.  After reviewing the medical evidence and Arena's testimony regarding his pain, the ALJ found that Arena's subjective complaints of pain were less

than fully credible.  Tr. 77.  Arena argues that the reasons given by the ALJ were insufficient to reject his subjective complaints of debilitating pain.  Doc. 13, p. 16. This argument is without merit.

A disability claim can be supported by a claimant's subjective complaints, as long as there is objective medical evidence of the underlying medical condition in the record.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 475.  "[I]f disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken."  *Id.* (citing 20 C.F.R. § 404.1529(c)(3)). To evaluate the credibility of a claimant's subjective reports of pain, a two-part analysis is used. 20 C.F.R. § 416.929(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.  *Rogers*, 486 F.3d at 247.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work.  *Id.*  The ALJ should consider the following factors in evaluating a claimant's symptoms:

1) the individual's daily activities;
2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
3) factors that precipitate and aggravate the symptoms;
4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p,

1996 WL 374186, *3.

However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones,* 336 F.3d at 476 (citations omitted).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 531 (6th Cir. 1997).  It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  *Rogers*, 486 F.3d at 247.  If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state his reasons so as to make obvious to the individual and to any subsequent reviewers the weight given to the individual's statements and the reason for that weight.  *See Cross v. Comm'r of Soc. Sec*., 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)*;* Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *2.

In this case, the ALJ recognized that Arena had a number of serious limitations caused by his severe impairments and accounted for these limitations his RFC determination by limiting Arena to a restricted range of sedentary work.  Tr. 621-22.  The ALJ concluded, however, that Arena's allegations that his symptoms were so severe that he could perform any work whatsoever were not credible to the extent they were inconsistent with the highly restrictive RFC assessment.  Tr. 626-27.  The ALJ set forth several reasons for discounting Arena's credibility in support of his determination, including statements made by Arena, statements made by Arena's treating physicians, the effectiveness/lack of side effects associated with Arena's pain medication/other pain treatment, and Arena's activity level.  Tr. 626-27.  *See* SSR 96-7p, 1996 WL 374186, at * (credibility analysis should include consideration of, among other things, the

objective medical record, the claimant's daily activities, the effectiveness of medication, and treatment received).

The ALJ first noted that Arena had made statements that detracted from his credibility. For example, in 2003, Arena told Dr. Rigby that he was taking narcotics that he obtained without a prescription, illegally. Tr. 412. A few months later, Arena presented to the emergency room and reported that he had been abusing narcotics that he had acquired illegally on the street. Tr. 190, 626. The fact that Arena was abusing medications that he obtained illegally casted some doubt on the veracity of his allegations of disabling pain.

The ALJ also discussed inconsistent statements from Arena's treating physicians that show that Arena was not as disabled as he alleged. These statements illustrated that Arena was making progress with his recovery, that he was unwilling to comply with certain treatment orders, and that he had an unusually low pain threshold. In particular, in April 2004, Dr. Pryce noted that Arena was unwilling to do the work that would increase the flexion in his left knee. Tr. 627. He also noted that Arena had an "unbelievably low pain tolerance" and had "no ability whatsoever of any kind to withstand even the most minute amount of pain." Tr. 627. That same month, Dr. Rigby noted that Arena was doing "quite well" post knee surgery. Tr. 414. In October 2004, Dr. Rigby noted that Arena had been doing "very well postoperatively. Tr. 417. And in 2007, Dr. Bressi noted that Arena's knee pain was "somewhat better." Tr. 907.

Additionally, the ALJ considered the effectiveness/lack of side effects associated with Arena's pain medication and other treatment for his pain. At the hearing, Arena stated that his medications helped his pain. Tr. 1145. Arena repeatedly denied any side effects from his medication. Tr. 447, 449, 454, 457, 466, 469, 472, 474, 477, 479, 1145. Arena also reported that his pain medications were adequate and there was no need for a change. Tr. 749. In

addition to pain medication, during the relevant time, Arena received a number of steroid/nerve block injections for his pain.  Tr. 442-46, 734-48, 757-62, 784-804, 813-17, 820, 928-30, 933, 937, 946.  He told Dr. Geiger, one of his pain management physicians, that he did very well with the injections and that he experienced good function increase after receiving same.  Tr. 749. Arena told Dr. Bressi that he had gotten "excellent relief" from epidural injections.   Tr. 907. Arena also participated in physical therapy and reported some improvement of his symptoms. Tr. 623.

The ALJ also considered Arena's activity level in rendering his credibility determination. At the hearing, Arena stated that he drove two to three times per week and the longest trip that he made in the past five years was about 50-60 miles.  Tr. 1141-42, 1147.  In 2003, Arena told Dr. Pryce that he was going to get a job or attend truck driving school.  Tr. 627.  Arena also reported that he had been cleaning out a gutter when he reported to the emergency room for a headache in 2003.  Tr. 192, 627.  Arena made inconsistent statements regarding mowing the lawn.  He told his physical therapist that he was mowing the lawn and submitted statements to the Social Security Administration to the same effect (Tr. 86, 123, 379, 381), but made written statements that he was unable to mow the lawn.  Tr. 142, 693.  In addition, throughout the record, Arena's activities of daily living were repeatedly described to be adequate or stable.  Tr. 448, 458, 470, 473, 475, 478, 480, 4751, 768, 770, 809, 811, 824, 826, 909.  The ALJ determined that Arena's activities did not support his claim of debilitating pain.  *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).

In sum, the ALJ provided several reasons for discounting Arena's credibility and his decision indicates that he considered the relevant factors under 20 C.F.R. § 404.1529(c)(3) and SSR 96-7p.  The ALJ credited Arena with pain and limitations from his medically determinable

24

impairments but also found, based on substantial evidence in the record, that the limiting effects of those impairments were not as severe as Arena alleged and did not preclude all work.  The ALJ therefore reasonably concluded that Arena was not fully credible in alleging an incapacity for all sustained work activity.

**C.     The ALJ Satisfied the Commissioner's Burden at Step Five of the Sequential Analysis**

In his last argument, Arena argues that the ALJ did not satisfy the Commissioner's burden at Step Five because the hypothetical he posed to the VE (and ultimately adopted by the ALJ in his RFC determination) did not accurately reflect Arena's limitations.  Doc. 13, pp. 18-20.  This argument is also without merit.

As correctly noted by Arena, once it has been determined that a claimant cannot perform his past relevant work, the burden shifts to Commissioner at Step Five to show that there are other jobs that exist in significant numbers in the economy that the claimant can perform, consistent with his or her RFC and vocational factors of age, education and work experience. *Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).  To satisfy this burden, the ALJ may rely on the testimony of a vocational expert as long as it is in response to a hypothetical that accurately reflects the claimant's physical and mental limitations.  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  In formulating the hypothetical, the ALJ only needs to incorporate those limitations he accepts as credible.  *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

In this case, the ALJ asked the VE a hypothetical question that included all of the limitations set forth in his RFC finding for Arena.  The VE responded that, based on the hypothetical question, there were a significant number of jobs in the national economy that such an individual could perform.  *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)

25

(holding that the ALJ was responsible for determining Plaintiff's RFC, then framing hypothetical questions to the vocational expert incorporating only the RFC).  The ALJ was not required to include limitations in the hypothetical that he determined to be unsupported by the evidence or not credible.  *See Casey*, 987 F.2d at 1235.  Therefore, the ALJ did not err, and the VE's testimony - given in response to a hypothetical that reasonably reflected all the limitations that the ALJ found valid and credible - constituted substantial evidence capable of supporting the Step Five finding.  The ALJ thus reasonably found Arena not disabled at Step Five.

Arena also appears to argue that the ALJ improperly applied, or relied on, the Medical-Vocational Guidelines (the Grid) in finding that Arena was not disabled prior to September 9, 2008.  Doc. 13, p. 20.  This argument is unpersuasive because the ALJ did not rely on the Grid in reaching his conclusion that Arena could perform a significant number of jobs in the national economy.  Instead, for the period prior to Arena's fiftieth birthday, the ALJ merely used the Grid as a framework for decision-making, in conjunction with the testimony of the VE, to reach his determination.  The ALJ correctly explained that, because Arena was not able to perform a full range of sedentary work, additional evidence was necessary to determine whether there were a significant number of jobs available in the national economy that Arena could perform.  Tr. 628.  The ALJ then asked the VE whether a person with Arena's RFC and vocational factors of age, education and work experience, could perform a significant number of jobs in the national economy.  Tr. 1157-58.  The VE responded that the hypothetical individual could perform significant work in the national economy.  It is therefore clear that the ALJ did not improperly reply on the Grid in this case.

Further, the regulations specifically allow the ALJ to use the services of a vocational expert when a claimant is limited to less than a full range of sedentary work.  20 C.F.R. §

26

404.1566(e); SSR 96-9p ("the adjudicator may use the resources of a vocational specialist or vocational expert. The vocational resource may be asked to provide any or all of the following: An analysis of the impact of the RFC upon the full range of sedentary work, which the adjudicator may consider in determining the extent of the erosion of the occupational base, examples of occupations the individual may be able to perform, and citations of the existence and number of jobs in such occupations in the national economy."). Thus, reliance on the VE's testimony was proper and such testimony constitutes substantial evidence in support of the ALJ's Step Five determination.

Finally, it should be noted that "issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006); *see also Erhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 537 n. 5 (7th Cir. 1992) (applying waiver rule because judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque manner.'"). Arena has failed to develop his argument regarding the ALJ's application of the Grid beyond a cursory discussion of the issue. The Court will not speculate as to what Arena's arguments might have been had he developed them. Thus, this argument is also deemed waived.[8]

---

[8] Arena also appears to suggest that he was disabled simply because he was not able to perform a full range of sedentary work. Doc. 13, p. 20. Again, under *McPherson,* 125 F.3d at 995–96, this argument is deemed waived because Arena has not made any attempt to develop it. Moreover, SSR 96-9p provides that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled' [and] consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience." SSR 96-9p, 1996 WL 374185, *1.

### VII.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff

Gregory Arena's application for DIB should be AFFIRMED.


Dated: May 16, 2012

_____
Kathleen B. Burke
United States Magistrate Judge


### <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).